UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

JOSE ROBLES,

Defendant.

---

08 Cr. 1114 (PAE)

<u>ORDER</u>

PAUL A. ENGELMAYER, District Judge:

The Court has received an application from defendant Jose Robles seeking a reduction of the sentence he is currently serving at Federal Correctional Institution ("FCI") Fort Dix pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  *See* Dkt. 93 ("Def. Mem.") at 2–3.  The Government opposes his request.  *See* Dkt. 98 ("Gov. Opp.") at 1.  For the reasons that follow, the Court intends to grant Robles's request for a sentence reduction after he exhausts his administrative remedies. *See* Dkt. 99.

I.     **Background**

On February 11, 2011, Robles was convicted after a jury trial of six counts related to three separate robberies he committed in 2005 and 2006.  *See* Gov. Opp. at 2.  Specifically, Robles was convicted of Count 1, for conspiring to commit Hobbs Act robberies in violation of 18 U.S.C. § 1951; Counts 2–4, for participating in the three separate Hobbs Act robberies in violation of 18 U.S.C. § 1951–2; and Counts 5–6, for brandishing, or aiding and abetting the brandishing of, a firearm in furtherance of two of those robberies, under 18 U.S.C. § 924(c).  *Id.*

The crimes for which Robles was convicted are serious.  On October 15, 2005, Robles and two other people robbed a Radio Shack in the Bronx.  *See* Gov. Opp. at 3–4.  During the

course of this robbery, Robles brandished a silver revolver, ordered employees to lie on the ground, yelled at them, kicked one employee, and pressed his gun against the back of her head. *Id.* Robles committed another robbery on November 15, 2005—this time with at least six other people—which targeted a different Radio Shack in the Bronx. *Id.* at 5. The robbers tied up the store's employees and put plastic bags over their heads. *Id.* at 6. One employee testified at trial that he was beaten by the robbers and had a knife put to his face. *Id.* Robles's fingerprints were found on two of the bags that were put over the victims' heads. *Id.* Also during the November 15 robbery, one of Robles's co-robbers brandished a gun. *Id.* On October 2, 2006, Robles committed a third robbery, this time of a gas station, with two other people. *Id.* at 7–8. Robles and another man approached a car carrying two of the station's employees, who were carrying the station's weekend proceeds to the bank. *Id.* at 8–9. One of the robbers displayed a gun, banged on the door, and demanded the money, which the employees gave them. *Id.*

On November 22, 2011, Judge Sweet issued his first sentencing opinion for Robles. *See* Dkt. 58 ("Sent. Op."). Robles faced a mandatory minimum sentence on Counts 5–6 (the two § 924(c) counts) of 32 years, to run consecutive to any other sentence. And Judge Sweet calculated Robles's advisory guideline sentence range on Counts 1–4 as 78 to 97 months' imprisonment. Judge Sweet downwardly varied from his calculated guideline range on these counts and imposed a sentence of 32 years (384 months) for all counts. *Id.* at 21–23. After imposition of this sentence, both the Government and Robles submitted memoranda arguing, for different reasons, that that sentence was erroneous as a matter of law. Dkts. 59–60. On February 3, 2012, Judge Sweet published a revised opinion recognizing that *United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008), prohibited him from using the adequacy of the sentence as a whole as a basis for imposing effectively a zero-months sentence on Counts 1–4; rather, the sentence on the

mandatory minimum offenses was required to run consecutively to the sentence found reasonable as to Counts 1–4.  Dkt. 61 ("Mod. Sent. Op.") at 18–21.  Judge Sweet also recalculated the Guidelines applicable to Robles and determined that the applicable Guidelines range for Counts 1–4 was 108 to 135 months' imprisonment, to be followed by 384 months' imprisonment on Counts 5–6.  As a result, Judge Sweet imposed a sentence of 36 months' imprisonment for Counts 1–4 to be followed by Robles's sentence of 32 years' imprisonment on the two § 924(c) counts, yielding a total prison sentence of 35 years' imprisonment.[1]  *Id.* at 24–25.  At Robles's second sentencing hearing, Judge Sweet expressed regret and frustration at the mandatory "stacking" of the sentences on the two § 924(c) convictions.  This, he stated, was "unfair, harsh, and irrational, but . . . required by law."  *Id.* at 25.  Robles has been incarcerated since his arrest in October 2008.  Def. Mem. at 7.

On February 10, 2021, Robles filed a *pro se* motion for compassionate release.  He primarily argued that the gap between the length of the sentence that he received in 2012 and the sentence he would receive today—given the First Step Act, which prospectively eliminates such mandatory stacking—is an "extraordinary and compelling" reason justifying a reduction of his sentence.  *See* Dkt. 83 ("Robles's Motion").  The next day, the Court asked Robles's trial counsel to file a memorandum in support of Robles's motion.  *See* Dkt. 84.  On May 12, 2021, Robles's counsel filed such a memorandum.  *See* Def. Mem. at 1, 15–17.  On May 28, 2021, the Government opposed that request on the grounds that (1) Robles's circumstances do not qualify as "extraordinary and compelling," and (2) the sentencing factors set forth in 18 U.S.C. § 3553(a) do not support a reduced sentence.

---

[1] The 36 months' imprisonment was below the Guidelines range of 108–135 months for Counts 1–4.

## II.  Discussion

### A.  Governing Legal Principles

Under 18 U.S.C. § 3582(c)(1)(A), a court:

[U]pon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The defendant bears the burden of proving that he is entitled to compassionate release under § 3582(c)(1)(A). *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit prisoners to initiate compassionate release proceedings and instead required the Bureau of Prisons ("BOP") to seek such release on their behalf. *United States v. Ebbers*, 432 F. Supp. 3d 421, 422–23, 427 (S.D.N.Y. 2020).  But with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended the law to allow defendants independently to seek compassionate release from federal courts. *Ebbers*, 432 F. Supp. 3d at 422–23.

Before the First Step Act, Congress had tasked the Sentencing Commission with identifying circumstances sufficiently extraordinary and compelling to justify a sentence reduction. *Id.* at 427 (citing 28 U.S.C. § 994(t)).  The Commission did so in U.S.S.G. § 1B1.13 and its corresponding commentary.  That guidance, *inter alia*, (1) sets out circumstances that

present extraordinary and compelling reasons justifying release; and (2) requires that a defendant not be a danger to the community. *Id.* § 1B1.13(1)–(3) & cmt. n.1(A)–(D).

By its terms, however, the Commission's guidance applies only to a "motion of the Director of the Bureau of Prisons." *Id.* § 1B1.13. And the Commission has not updated § 1B1.13 or its commentary to reflect the First Step Act's amendment to § 3582(c)(1)(A) authorizing defendants to move for compassionate release on their own, without BOP intervention. Accordingly, although courts—including this one—had treated the Commission's guidance as applicable to all compassionate release motions, *see, e.g.*, *United States v. Hernandez*, 451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020); *see also Ebbers*, 432 F. Supp. 3d at 428, the Second Circuit has recently clarified that § 1B1.13 "is not 'applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020); *see also id.* at 237 ("Neither Application Note 1(D), *nor anything else in the now-outdated version of Guideline § 1B1.13*, limits the district court's discretion." (emphasis added)).

Consistent with *Brooker*, in assessing a § 3582(c)(1)(A) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons or by its freestanding requirement that the defendant seeking release not pose any danger to the community. Rather, the Court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," § 3582(c)(1)(A)(i), may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Brooker*, 976 F.3d at 237.

### B.  Application to Robles

Robles has been imprisoned for nearly 13 years on his 35-year sentence.  He urges the Court to reduce his sentence to "time served."  *See* Def. Mem. at 3.  Although the Court is unpersuaded that a sentence reduction on the scale that Robles seeks is warranted, the Court finds that, viewing the facts as a whole, there are "extraordinary and compelling" reasons which justify an earlier release date than the one presently set.

#### 1.    The First Step Act

The First Step Act ("FSA"), enacted in December 2018, abolished the mandatory "stacking" of sentences for multiple § 924(c) offenses.  It did not, however, make that change retroactive.  First Step Act, § 403; *see United States v. Rodriguez*, 15 Cr. 445 (PAE), 2020 WL 8768320, at *2 (S.D.N.Y. Aug. 18, 2020) (holding FSA "not retroactive to offenses that were final at time of the act's enactment").  By its terms, however, the non-retroactive nature of the FSA does not dictate whether, in applying the compassionate release statute, § 3582(c)(1)(A), a Court may, in its discretion, consider this change in law.  "The Court's discretion is obviously not constrained by the non-retroactive nature of the changes [to certain mandatory minimum sentences in the FSA], nor will the Court blind itself to the First Step Act's sentencing reforms when assessing [the defendant's] application."  *See Musa v. United States*, 502 F. Supp. 3d 803, 812 (S.D.N.Y. 2020); *see also United States v. Haynes*, 456 F. Supp. 3d 496, 516 (E.D.N.Y. 2020) ("[The non-retroactive nature of the FSA] does not mean that the court may not or should not consider the effect of a radically changed sentence for purposes of applying § 3582(c)(1)(A)." (quotation omitted)).

Had the FSA been in effect in 2012, when Robles was sentenced, he would not have faced a mandatory consecutive sentence of 32 years on the two firearms counts: seven years on

the first, followed by 25 years on the second.[2]  Instead, the mandatory minimum sentence for the two § 924(c) offenses would be 14 years, as the two mandatory minimum terms required to run consecutively would have each been seven years.  *See* § 924(c)(1)(D) ("Notwithstanding any other provision of law . . . no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person.").  These would have been required to run consecutively to the sentence on Counts 1–4, as to which an advisory Guidelines sentencing range of 108–135 months' imprisonment applied.  *See* Mod. Sent. Op. at 16.  Thus, even assuming a sentence within the Guidelines range on Counts 1–4, Robles's aggregate sentence, rather than being 35 years, would have been between 23 years (14 years plus 108 months) and 25 years and 3 months (14 years plus 135 months).

Robles argues that the consequential change in the law's treatment at sentencing of multiple firearms counts presents an "extraordinary and compelling" reason which—viewed in combination with other factors, to wit, the unjust length of his sentence, the disparity of his sentence from those of his co-defendants, and the impact of the COVID-19 pandemic—together justify a sentence reduction.

There is a split of authority whether the FSA's change in law, by itself, constitutes an "extraordinary and compelling" circumstance under § 3582(c)(1)(A) to justify reducing a pre-FSA sentence of an offender convicted of a crime which had its mandatory minimum sentence reduced by the FSA.  Two Courts in this District have held that such a difference alone is not enough.  *See United States v. Lorenzano*, 03 Cr. 1256 (JFK), 2021 WL 734984, at *3 (S.D.N.Y. Feb. 24, 2021) ("Accordingly, the Court cannot conclude that, standing alone, Congress's recent

---

[2] At the time Robles was sentenced, the stacking of those two sentences was required by 18 U.S.C. § 924(c)(1)(C)(i).

amendment to § 924(c) constitutes an extraordinary and compelling reason for a reduction to Lorenzano's sentence."); *Musa*, 502 F. Supp. 3d at 812 ( "[T]his change in law is not enough, standing alone, to automatically merit Musa's release . . . .  [T]he Court concludes that the recent changes in the law support Musa's application, but that discretionary relief is not warranted because Musa has failed to identify additional, individualized factors justifying his release."). Outside of this District, however, some courts have held that the FSA's change of law alone justifies relief under § 3582.  *See, e.g.*, *United States v. Avery*, No. 04 Cr. 243, 2021 WL 949482, at *6 (E.D. Pa. Mar. 12, 2021) ("[T]he disparity in sentences resulting from the FSA's amendment of the Section 924(c) stacking provision alone may constitute an extraordinary and compelling reason under Section 3582."); *United States v. Redd*, 444 F. Supp. 3d 717, 722–24 (E.D. Va. 2020) ("Congress [has concluded] that [§ 924(c)] sentences . . . are unfair and unnecessary," and, as a result, are "extraordinary and compelling reasons that warrant a reduction to Mr. Redd's sentence of incarceration.").

Critically here, however, courts have widely recognized that the FSA's change of law, when combined with other "extraordinary and compelling" reasons, can constitute sufficient grounds to justify a sentence reduction under § 3582.  *See, e.g.*, *United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020) ("[T]he severity of a § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence a defendant would receive today, can constitute an 'extraordinary and compelling' reason for relief under § 3582(c)(1)(A)." (collecting cases)); *Haynes*, 456 F. Supp. 3d at 514 ("[When combined with] the brutal impact of Haynes's original sentence, its drastic severity as compared to codefendant['s] ten-year term, its harshness as compared to the sentences imposed on similar and even more severe criminal conduct today, and the extent to which that brutal sentence was a penalty for Haynes's exercise of his

constitutional right to trial . . . the FSA'[s] elimination of the § 924(c) sentencing weaponry . . . is an extraordinary and compelling circumstance warranting relief under § 3582(c)."); *United States v. McDonel*, 07 No. 20189, 2021 WL 120935, at *4 (E.D. Mich. Jan. 13, 2021) ("McDonel is eligible for compassionate release because of his harsh sentence—which would not be imposed under the law today—together with his youth and record of rehabilitation . . . ."); *United States v. Pitts*, 94 Cr. 70068, 2020 WL 1676365, at *7 (W.D. Va. Apr. 6, 2020), *aff'd*, 829 F. App'x 597 (4th Cir. 2020) ("Congress did not intend the sentencing disparity between defendants sentenced before and after the § 924(c) amendment to constitute a sufficient basis on its own to grant the reduction Pitts seeks.  Instead, that factor is only one of many that the court should consider, as set forth in § 3553(a).").

This Court agrees.  Like the courts above, the Court holds that—when other factors support a sentence reduction—the FSA's significant downward reduction in the sentence mandated by multiple firearms counts may also be considered in the § 3582 equation.  Here, the Court finds, Robles has identified three "additional, individualized factors justifying his release" beyond the FSA's change of law.  *See Musa*, 502 F. Supp. 3d at 812.

## 2.    Injustice Finding at Original Sentencing

First, the original sentencing record reflects an explicit determination by the sentencing judge that the sentence imposed was unjust.  Judge Sweet repeatedly denounced the sentence he was obliged to impose as unjust, including in light of the § 3553(a) factors.  He stated: "It is a rare and sad occasion as a judge that I am required by my oath to enforce unjust and ill-advised enactments of Congress.  Today I am asked to do such a thing."  Sent. Op. at 1.  He denounced the outcome yielded in Robles's case by the mandatory stacking of the 7- and 25-year firearms sentences as "a profound moral injustice," a "profound moral failing," and "draconian."  *Id.* at 3–

9

4, 22–23.  As Judge Sweet explained: "While Robles'[s] actions were unlawful, frightening, and above all stupid, the mandatory minimum sentence of 32 years is inappropriate and plainly not necessary.  Far more serious offenders receive a mere fraction of that which must be imposed on Robles today."  *Id.* at 21.  Judge Sweet termed the outcome "harsh, unfair, and irrational," and called for congressional action to avoid similar outcomes.  *Id.* at 28.

Independent of Congress's enactment of the FSA, the finding at the time of sentencing that the sentence imposed was unjust and excessive supports relief under § 3582.  A reduction of Robles's sentence would therefore not mark a *post hoc* reassessment, so much as a belated installation of a sentence, as recognized at the time of sentencing, consistent with § 3553(a) and principles of just sentencing.  *See United States v. Maumau*, 08 Cr. 758, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020), *aff'd*, 993 F.3d 821 (10th Cir. 2021) ("This court has repeatedly expressed its concern regarding the length of [defendant's] sentence . . . [the defendant's] age, the length of sentence imposed, and the fact that he would not receive the same sentence if the crime occurred today all represent extraordinary and compelling grounds to reduce his sentence."); *United States v. Young*, 458 F. Supp. 3d 838, 840 (M.D. Tenn. 2020) ("The court stated on the record that the reason for the sentence on the § 924(c) counts was that the court had no choice . . . and that the disproportionate sentence was 'a tragedy.'").

### 3.    Disparity With Co-Defendants' Sentences

Second, the 35-year sentence imposed on Robles creates a disparity with the sentences of his co-defendants that, given its vast scale, is not justifiable.  Multiple courts have identified unwarranted sentence disparities as justifying relief under § 3582.  *See, e.g.*, *United States v. Cabrera*, No. 10 Cr. 94-7 (JSR), 2021 WL 1207382, at *6 (S.D.N.Y. Mar. 31, 2021) ("[T]he extraordinary length of Cabrera's sentence relative to his offense, especially given his negligible

criminal history; the significant, unwarranted disparity between Cabrera's sentence and the sentence of his codefendants; and Cabrera's substantial evidence of rehabilitation . . . together, demonstrate extraordinary and compelling circumstances warranting a sentence reduction."); *United States v. Ramsay*, No. 96 Cr. 1098 (JSR), 2021 WL 1877963, at *17 (S.D.N.Y. May 11, 2021) (holding that a lower sentence "is consistent with the § 3553(a) factors" because of the defendant's "youth at the time of the offense, his upbringing, and his evidence of rehabilitation," together with the fact that his co-conspirators had since been paroled, but the defendant, "meanwhile, is less than fifty years old; if this motion were denied, he could expect to live decades more behind bars. The Court sees no reasonable basis for such an extreme sentencing disparity.").

Here, the crew with which Robles committed the robberies in question consisted of approximately six individuals. They participated, to varying degrees, in the three charged robberies. *See infra* n.5; Gov. Opp. at 3–9. Two members of Robles's crew, Luis Celado and Jose Rodriguez, were indicted alongside Robles as co-defendants. *See* Dkt. 18. Each pled guilty pursuant to a plea agreement with the Government. Neither was sentenced to a day of incarceration. *See* Dkt. 57 ("Celado Sent. Tr.") at 16; Dkt. 71 ("Rodriguez Sent. Tr.") at 7.

As to Celado, he was charged in the same indictment counts as Robles for Counts 1–4, 5 and 6, including the two firearms counts. Under his plea agreement, however, he pled guilty only to Count 1, which charged a conspiracy to commit Hobbs Act robberies of Radio Shack stores. *See* Dkt. 55 ("Celado Sent. Op.") at 1–5; Dkt. 73. Unlike Robles, Celado did not personally brandish a gun during the three robberies in which he and Robles participated. But his criminal conduct was substantial. He was an active participant and planner of two Radio Shack robberies, and helped remove cash and merchandise from both stores. *See* Gov. Opp. at

3–6; Celado Sent. Tr. at 12; Dkt. 51 ("Robles Trial Tr.") at 128–29 (co-conspirator Lenny Marmolejos testifying as to the second robbery: "Luis would come in [after the victims had bags placed over their heads], he would pick up two bags [filled with Radio Shack merchandise] and he would take them out front where the van was.").  During the first robbery, which was of the Radio Shack where Celado worked, Celado pretended to be a victim while removing approximately $4,500 in cash from the store's register and handing it to a co-conspirator.  *See* Celado Sent. Tr. at 12; Celado Sent. Op. at 9.  Pretending to have been a victim, Celado, afterwards, even provided a statement to the police who investigated the robbery.  *See* Celado Sent. Op. at 9; Celado Sent. Tr. at 13.  During the second robbery, Celado and Robles entered the store only after their co-conspirators had taken over the store, bound the employees in the back room, and had placed bags over the employees' heads.  *See* Gov. Opp. at 5; Robles Trial Tr. at 127.  After co-conspirators, including Robles, took the Radio Shack merchandise off the shelves and packed it into bags, Celado took these outside for loading into the van.  *See* Gov. Opp. at 5–6; Robles Trial Tr. at 127–29.  Pursuant to the plea agreement, Celado's one count of conviction, to the Hobbs Act conspiracy, carried an advisory guideline range of 78–97 months, a non-mandatory minimum sentence.  Judge Sweet sentenced him to 40 months' probation, subject to a condition of home detention.  Celado Sent. Op. at 14, 20.

As to Rodriguez, he was charged in two counts: Count 1 (conspiring to commit Hobbs Act robberies) and Count 4 (participating in Hobbs Act robbery of gas station).  Dkt. 68 ("Rodriguez Sent. Op.") at 1–2.  Rodriguez pled to both counts, neither of which were firearm counts, pursuant to a cooperation agreement.  *See* Dkt. 66 at 4; Dkt. 70.  His criminal conduct, too, was substantial.  Along with Robles and a third co-conspirator, Rodriguez planned to rob a gas station in Yonkers, New York.  At around 10 a.m., Rodriguez drove Robles and the third co-

conspirator up behind a car carrying two employees of the gas station who were transporting the station's weekend proceeds to the bank.  *See* Rodriguez Sent. Op. at 5; Rodriguez Sent. Tr. at 5; Gov. Opp. at 8.  When the employees' car stopped at a red light, "Robles, Rodriguez, and the co-conspirator" approached the car, and "then brandished firearms and demanded 'the bag' from the Gas Station Victims," and the cash it contained, as well as one of the employees' personal effects.  Rodriguez Sent. Op. at 5–6; Rodriguez Sent. Tr. at 5; Gov. Opp. at 8–9.  Rodriguez then drove all three men away from the scene.  *See* Rodriguez Sent. Tr. at 5.  Judge Sweet calculated Rodriguez's pre-departure advisory guidelines sentencing range as 46–57 months, and sentenced Rodriguez to "no time, no incarceration and probation for a period of one year."  Rodriguez Sent. Tr. at 7; Rodriguez Sent. Op. at 10.

To be sure, there were salient differences between Robles, on the one hand, and Celado and Rodriguez on the other, justifying imposition on Robles of, by far, the longest prison term.  Robles's offense conduct was the most serious.  He participated in the most robberies; alone personally brandished firearms; and more than the others was a leader in the offenses.  Further justifying the lower sentences, the other two defendants pled guilty, justifying acceptance of responsibility credit.  And Rodriguez earned a 5K1.1 letter, meriting a consequent downward departure for his cooperation.

Nonetheless, the 35-year difference between the sentences imposed on Robles and his co-conspirators—particularly Celado, a non-cooperator who had been charged in the same counts as Robles—is eye-popping.  No doubt contributing to Judge Sweet's dismay at the sentence he was obliged to impose on Robles, more than 90% of the disparity (32 years) between the Robles and Celado sentences results from the Government's decision to proceed to trial against Robles on the two mandatory-consecutive firearms counts, while dropping these counts against Celado in

consideration for his plea to a Hobbs Act robbery conspiracy.  In these circumstances, a sentence reduction is warranted in the interests of yielding more compatible sentence among these co-defendants.

> ### 4.      Impact of the Pandemic on Conditions of Confinement

Third, the COVID-19 pandemic has made Robles's imprisonment far more grueling than Congress, or Judge Sweet, had reason to anticipate.  *See infra* n.7.  As courts have widely recognized in granting compassionate release motions since March 2020, the unexpected rigors of incarceration during the pandemic present "extraordinary and compelling" reasons that can justify a sentence reduction under § 3582(c)(1)(A).

The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation.  The crowded nature of federal prisons in particular has presented an outsized risk that the COVID-19 contagion, once it gains entry, will spread.[3]  In that respect, COVID-19 has posed a heightened health risk to all inmates.  Robles was infected with COVID-19, but recovered with (to date) no short- or long-term complications.  *See* Gov. Opp. at 23–24.  But the pandemic has subjected even healthy inmates to unexpectedly rigorous prison conditions.

In particular, the pandemic has subjected all inmates to far more restrictive conditions of confinement than normal incarceration.  It has limited inmates' access to visitors such as family, to counsel, and to rehabilitative, therapeutic, and recreational programs.   And it has given rise to

---

[3] *See* Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (May 20, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also United States v. Nkanga*, 450 F. Supp. 3d 491, 492 (S.D.N.Y. 2020) (citing *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention 2 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf) (highlighting danger faced by those in jails and prisons).

fears of infection and worse by inmates.  In these respects, the pandemic has spawned conditions of confinement far more punishing than what could have been expected at the time of Robles's sentencing.

In light of these circumstances, this Court has recognized that "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison" and "[w]hile such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *United States v. Lizardi*, No. 11 Cr. 1032 (PAE), Dkt. 2532 at 7 (S.D.N.Y. Oct. 9, 2020); *see United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." (citation omitted)); *United States v. Salemo*, No. 11 Cr. 0065-01 (JSR), 2020 WL 2521555, at *3 (S.D.N.Y. May 17, 2020) ("noting that the BOP has taken a number of steps to mitigate the spread of the virus in federal prisons . . . [including] restrictions on visitors, restrictions on gatherings . . . [and] lockdowns lasting at least 14 days"); *United States v. Smalls*, No. 20 Cr. 126 (LTS), 2020 WL 1866034, at *2 (S.D.N.Y. Apr. 14, 2020) (noting that the "BOP has instituted a mandatory 14-day quarantine lockdown of all inmates across the BOP system").

The Court accordingly—in cases in which it has determined that a reduced term of imprisonment is compatible with the § 3553(a) factors—has granted compassionate release under § 3582 to numerous inmates in light of the health risks, and grueling conditions of confinement, presented by COVID-19.  *See, e.g.*, *Hernandez*, 451 F. Supp. 3d at 303–04

(granting compassionate release to defendant with non-severe asthma who had served about half of his 24-month sentence which had been reduced with credit for good behavior); *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) (same for defendant with medical conditions putting him at heightened risk of severe COVID-19 and who had served 75% of effective sentence); *United States v. Benjamin*, No. 15 Cr. 445 (PAE), Dkt. 1144 at 6–7 (S.D.N.Y. Sept. 15, 2020) (same for defendant with asthma who had served nine years of his 10-year sentence); *United States v. Wilson*, No. 16 Cr. 317 (PAE), Dkt. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (same for defendant with heighted vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 482 F. Supp. 3d 151, 154–56 (S.D.N.Y. 2020) (same for elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy).  The Court has also granted compassionate release to inmates without serious health conditions who were near the end of their sentence based on the unforeseen grueling conditions of confinement presented by COVID-19 and the additional punishment suffered as a result.  *See, e.g.*, *Lizardi*, No. 11 Cr. 1032, Dkt. 2532 at 9–10 (granting early release for a defendant with no heightened medical vulnerability to COVID-19 who had served 93 months of a 121-month sentence and was scheduled to be released to a halfway house in five months); *United States v. Romero*, No. 15 Cr. 445-18, Dkt. 1184 at 6 (S.D.N.Y. Apr. 16, 2021) (granting the same for a defendant with factually disputed heightened vulnerability to COVID-19 who had served 65 months of a 69-month sentence).

For similar reasons, numerous courts acting under § 3582, while not granting immediate release, have reduced sentences.  *See, e.g.*, *Rodriguez*, 492 F. Supp. 3d at 311 (granting sentence reduction for defendant in part due to fact that the pandemic made "Rodriguez's incarceration

16

harsher and more punitive than would otherwise have been the case"); *United States v. Pellot*, No. 19 Cr. 169 (VM), 2021 WL 807242 (S.D.N.Y. Mar. 3, 2021) (granting sentence reduction pursuant to § 3582(c)(1)(A)); *United States v. Fisher*, 493 F. Supp. 231 (S.D.N.Y. Oct. 9, 2020) (same). And in pending cases, the Court, in imposing sentence, has, based on the impact of COVID-19 on the defendant's conditions of incarceration, imposed materially lower sentences than it otherwise would have. *See, e.g.*, *United States v. Marmolejos*, No. 19 Cr. 626 (PAE), Dkt. 25 at 32–33 (S.D.N.Y. Nov. 24, 2020) (granting a sentence "farther below the guidelines sentence it otherwise would have been on account of the conditions in which [the defendant had] been held [due to COVID-19]," where "a day spent in terribly substandard prison conditions [created as a result of the pandemic] . . . exacts more punishment for an incarcerated defendant than a day in ordinary conditions"); *United States v. Kelly Rivas*, No. 19 Cr. 529 (PAE), Dkt. 46 at 24 ("The [pandemic] has resulted in extreme lockdowns within [jails], on restrictions on family visits and contact, and on restrictions on visits and contact from attorneys . . . . The fact that the past eight months of [defendant's] custody has been in trying and harrowing conditions . . . is a reason to impose, all things being equal, a lower sentence than otherwise."); *United States v. Ellison*, No. 18 Cr. 834 (PAE), Dkt. 582 at 80–81 ("In reflecting on the just sentence, I am mindful . . . [that the prison] conditions [] have made the experience of being incarcerated in jail much harder and more scary than could ever have been anticipated or intended . . . . [T]he sentence I impose today will be below the sentence I otherwise would have imposed . . . in recognition of the rigors you have faced in prison since [the start of the pandemic].").

Robles similarly qualifies for some reduction of sentence on this analysis. To date, he has spent more than 16 months in custody during COVID-19, at FCI Fort Dix. The conditions at

that facility, as elsewhere, have been restrictive in light of the pandemic. *See* Def. Mem. at 17–18; Gov. Opp. at 15–16 (acknowledging that more than 50% of FCI Fort Dix's inmates, including Robles, contracted the virus and that the prison has implemented "strict" protocols to curb the spread of the virus and reduce contagion rates). At Fort Dix during the height of the pandemic, all visitations were canceled, and inmates were only allowed to leave their housing units "to obtain grab-and-go meals, attend scheduled medical appointments, attend General Education Degree (GED) classes and scheduled outdoor recreation." *United States v. Rodriguez*, No. 16 Cr. 07 (AJN), (S.D.N.Y. Nov. 20, 2020), Dkt. 59, Ex. A ¶ 18–19. These harsh conditions of confinement, consistent with the experiences at other prisons, have thus been far more punishing than intended. *See, e.g.*, *United States v. Rodriguez*, No. 16 Cr. 07 (AJN), 2020 WL 7640539, at *4 (S.D.N.Y. Dec. 23, 2020) ("The COVID-19 outbreak at FCI Fort Dix has also had serious effects on inmates' wellbeing apart from medical risks. The facility has prohibited all visitation and greatly restricted inmate movement. Considering these factors, the Court joins those others that have held that the current COVID-19 situation in FCI Fort Dix may qualify as an extraordinary and compelling circumstance supporting compassionate release, even for an inmate who has already apparently recovered from COVID-19." (citations omitted)); *United States v. Coke*, No. 07 Cr. 971 (LTS), 2021 WL 1578805, at *2 (S.D.N.Y. Apr. 22, 2021) (describing "conditions of [] confinement" at FCI Fort Dix as of spring 2021 as "more onerous" than risks posed to inmates by COVID-19); *United States v. Rodriguez*, No. 17 Cr. 449-3 (KPF), 2021 WL 242549, at *4 (S.D.N.Y. Jan. 25, 2021) ("Court is appropriately concerned about . . . [the] current conditions of confinement at FCI Fort Dix"). As a result, courts have granted compassionate release to various prisoners in Fort Dix since the onset of the pandemic. *See, e.g.*, *United States v. Tazewell*, No. 07 Cr. 1035 (RMB), 2021 WL 21980, at *4 (S.D.N.Y. Jan. 3,

2021) (granting compassionate release in part because "Courts have increasingly recognized the significant rise and outbreak of COVID-19 at FCI Fort Dix in support of their determinations of compassionate release" (collecting four cases)). [4]  It is, further, reasonable to project that, even with the pandemic abating, conditions of confinement will remain restrictive for some time to come.  That regrettable prospect has, if anything, been made more likely by the recent surge in the pandemic as a result of the spread of the Delta variant.

### C.  Section 3553(a) Factors

The presence of extraordinary and compelling reasons for early release, however, is only one requirement to grant such release.  The Court must also assure itself that release accords with "the factors set forth in section 3553(a) to the extent that they are applicable" before doing so. § 3852(c)(1)(A).  Those factors are: (1) the nature and circumstances of the offense as well as the nature and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense and just punishment, (b) provide deterrence, (c) protect the public, and (d) provide the defendant with needed educational or vocational training or medical care. § 3553(a)(2)–(3).  Here, although the § 3553(a) factors require a very long sentence, they favor granting Robles's motion for a reduction of the sentence Judge Sweet was compelled to impose.

As to the seriousness of the offense and just punishment, the Court shares Judge Sweet's assessment that Robles's original sentence of 35 years' imprisonment far exceeded the bounds of just punishment.  Sent. Op. at 3–4, 21–23, 28; Def. Mem. at 18.  Robles was age 23 when he

---

[4] Other courts in this District have held that the COVID-era medical conditions at FCI Fort Dix do not, on their own, constitute "extraordinary and compelling" circumstances.  *See United States v. Suarez*, No. 16 Cr. 453 (RJS), 2020 WL 7646888, at *3 (S.D.N.Y. Dec. 23, 2020) (collecting cases).  But these decisions (1) focused on the medical risks to inmates, not the harsh conditions of confinement caused by the pandemic, and (2) did not, unlike here, consider these conditions in conjunction with other bases for a sentence reduction.

participated in the robberies for which he is convicted.  As serious as they were, the robberies, which netted a total of more than $130,000, Gov. Opp'n at 4, 5–6, 9, do not warrant his incarceration for his entire adulthood into potentially his 60s.  *See* Sent. Op. at 20–21 ("Even under the mandatory minimum term, Robles will be well into middle age when released into the community . . . While Robles'[s] actions were unlawful, frightening, and above all stupid, the mandatory minimum sentence of 32 years is inappropriate and plainly not necessary.").

As to specific deterrence and the need to protect the public, neither require a 35-year sentence.  The Government points towards the violence of Robles's robberies, Robles's failure to accept responsibility, and his lackluster prison experience.  Gov. Opp. at 34–36.  As reasons for a lengthy sentence, including to justify Robles's continued confinement beyond the present, these points have traction.  But they do not require a sentence of a length much more often reserved for murderers, kidnappers, or egregious sex offenders.  Particularly given Robles's youth at the time of his offense, it is conjecture to forecast that society would need protection from him three and a half decades later.

Although not necessary to this conclusion, Robles's post-offense conduct reinforces the lack of a need for a sentence of the length that Judge Sweet was compelled to impose as a means of assuring public protection.  On the contrary, it suggests welcome maturation.  After receiving a sentence of five years' probation in December 2006 for a separate offense (criminal possession of heroin), Robles did not (at least as reflected in his rap sheet) engage in further crime.  Instead, he successfully completed a drug program, appears to have committed himself to his faith, and began working gainfully at a furniture store in the Bronx while making additional income by delivering furniture.  During the 22 months between December 2006 and his arrest for the charged offenses in October 2008, Robles was living with his then-partner Francia and their son

Kevin—both of with whom Robles remains close.  *See* Def. Mem. at 7–8, 11; Sent. Op. at 16–17.  These facts also favorably bear on the § 3553(a) factor of the history and characteristics of the defendant.[5]

### D.   The Government's Arguments

The Government raises two primary arguments in opposition to Robles's motion for compassionate release.  Gov. Opp. at 27–34.

First, it urges the Court not to treat § 3582(c)(1)(A) as an "end-run around" what the Government terms Congress's decision "that defendants who were sentenced [for multiple § 924(c) offenses] before the First Step Act was enacted would *not* be eligible for a relief under the statutory sentencing scheme."  *Id.* at 30, 28 (emphasis in original).  But, although the FSA does not entitle defendants sentenced for pre-FSA § 924(c) offenses to a re-sentencing, it also does not prohibit courts presented with compassionate release motions under § 3582(c) from considering, among other factors, the vast disparity in sentences imposed on like offenders depending on whether sentencing was before and after the FSA.  *See supra* p. 6.  Put differently, although Congress chose not to make its reduction to the mandatory sentences under § 924(c) retroactive, which would have occasioned "an avalanche of applications and inevitable re-sentencings" for pre-FSA cases, *Haynes*, 456 F. Supp. 3d at 516, it has not barred district courts from making fact-specific determinations, under the separate relief mechanism of § 3582(c), that

---

[5] Although Robles's record in prison does not bear decisively on his application for sentence reduction, it does not reflect any violent conduct.  During his approximately 13 years in prison, Robles has been sanctioned eight times—four for what the Government terms "relatively minor violations," three for possessing unauthorized items, and one for consuming homemade intoxicants.  *See* Gov. Opp. at 14, 35.  He has taken two 24-hour courses in 2019—a "money smart" course and a farm administration course—and has worked as a cook and a barber.  *Id.* at 14–15; Def. Mem. at 11.

individual defendants have shown, based on the totality of circumstances, "extraordinary and compelling" reasons justifying a sentence reduction.  *See Brooker*, 976 F.3d at 236.

Second, the Government states if it had known that Robles would later attempt to reduce his sentence based on the FSA's sentencing change, the Government could have charged Robles with *four* § 924(c) offenses, each carrying a mandatory consecutive seven-year sentence post-FSA.[6]  Gov. Opp. at 32 ("If [under the post-FSA regime] the Government wanted to achieve a similar outcome [to Robles's 35-year sentence], it could have charged Robles with four Section 924(c) counts, each with brandishing, resulting in a 28-year mandatory minimum sentence even after application of the First Step Act, and a Guidelines sentence of a 35¼ to 37 years' imprisonment: more than he actually received.").  Therefore, the Government states, it could have secured, post-FSA, a mandatory 28-year sentence by stacking firearms counts, on top of the sentence deemed appropriate for Counts 1–4.  *Id.*  This charging stratagem, it notes, would have neutralized Robles's argument that consistency with the FSA supported a sentence reduction.

Be that as it may, sentencing is the Court's province.  Even assuming that a hypothetical prosecutor would have charged Robles with four separate § 924(c) counts—a charging practice this Court has not seen for any post-FSA defendant in a case not involving the discharge of a firearm—in considering a post-sentence application under § 3582(c), the Court has discretion to determine whether extraordinary circumstances justify a sentence reduction and whether the § 3553(a) factors are compatible with a reduced sentence.  That discretion empowers the Court to reassess, under the standards set by § 3582(c), a sentence earlier dictated by stacked firearms

---

[6] In so arguing, the Government's memorandum alleges that Robles participated in—and implies that the Government could have established—another gas station robbery about a month and a half before the Hobbs Act robberies underlying his convictions.  Gov. Opp. at 7–8.

counts.  In this case, that analysis justifies a sentence reduction, whether or not a hypothetical prosecutor, determining the charges to pursue at a post-FSA trial against Robles, might have felt it necessary to stack four rather than two § 924(c) counts in addition to the four non-firearms counts.

## CONCLUSION

For the reasons set out above, the Court, pursuant to the authority granted to it by § 3582(c)(1)(A), will therefore reduce Robles's sentence, after he has exhausted administrative remedies.  Upon receiving written notice being filed that he has done so, the Court will give the defense one week to submit a revised letter addressing the extent of a sentence reduction, and the Government a week thereafter to respond.  The Court does not authorize a reply.

SO ORDERED.

_Paul A. Engelmayer_
PAUL A. ENGELMAYER
United States District Judge

Dated: August 10, 2021
       New York, New York